**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

GREGORY NAKAI,
            *Defendant-Appellant.*

No. 03-10485

D.C. No.
CR-01-01072-FJM

OPINION

Appeal from the United States District Court
for the District of Arizona
Frederick J. Martone, District Judge, Presiding

Argued and Submitted
May 9, 2005—San Francisco, California

Filed June 27, 2005

Before: Stephen Reinhardt, John T. Noonan, and
Ferdinand F. Fernandez, Circuit Judges.

Opinion by Judge Noonan

**COUNSEL**

John R. Hannah, Phoenix, Arizona, for the defendant-appellant.

Vincent Q. Kirby, Assistant United States Attorney, Phoenix, Arizona, for the plaintiff-appellee.

**OPINION**

NOONAN, Circuit Judge:

Gregory Nakai appeals his conviction of a set of serious federal crimes committed on an Indian reservation: premeditated first degree murder; robbery; felony murder-kidnaping; carjacking resulting in death; felony murder-robbery and use of a firearm during the commission of crimes of violence. We affirm the convictions.

## FACTS

At trial, the government established that on August 17, 2001, the defendant Gregory Nakai (hereafter Gregory) and his brothers, Jimmy and Jakegory, all members of the Navajo tribe, had been drinking. They went to Round Rock Lake to sell bottles of Budweiser beer and were joined by Johnny Orsinger, Teddy Orsinger, and Dennie Leal. They sold several 40 ounce bottles to Jesbert Sam and David Begay. At some point, Gregory said, "Let's jack up these guys." Jimmy understood his brother to mean that they should beat Begay and Sam and take their car. When Begay tried to buy another bottle, the group jumped on him and hit him. Gregory knocked him down with blows to his head. Jakegory and Leal kicked him as he lay on the ground.

Leal approached Sam as Sam sat in his own car and knocked him from his seat to the ground. Leal and Johnny Orsinger hog-tied Sam and Begay with electrical cords. The two victims were dumped in the back of Sam's car. Jimmy took the driver's seat and drove off accompanied by Johnny Orsinger. Jimmy had with him Gregory's handgun, which Jimmy gave to Johnny, who pistol-whipped Sam about ten times as they drove.

Gregory, Jakegory, Teddy Orsinger, and Dennis Leal followed Jimmy in Gregory's car, which he was too drunk to drive and which was driven by Teddy, who accidentally flipped it. Gregory joined Jimmy and Johnny in Sam's car, which Jimmy drove into the woods and stopped. Johnny took Begay, who was still conscious out of the back and laid him on the ground. Gregory did the same with Sam, who wasn't moving. A little later Jimmy heard a shot and turned to see that Begay had been shot in the head and that Johnny was standing next to him with a gun in his hand. Gregory said, "Give me the gun." Johnny gave it to him. Gregory shot Sam five times in the chest and/or head. Jimmy believed both

Begay and Sam were now dead. Gregory covered the bodies with a blanket.

Gregory, Jimmy, and Johnny rejoined Leal, Teddy Orsinger, and Jakegory. The group decided to burn the bodies of the victims and made a fire for this purpose. They cleaned Sam's car of broken glass. Gregory took Sam's drill and traded it for a pair of tires that he put on his own car. The next day, Gregory, Jimmy and Leal retrieved some of the remains of one victim, put them in a bag and burned them in a hole.

## PROCEEDINGS

In November 2001, Jimmy provided an FBI agent with information about the murders. Gregory was arrested and advised of his rights. The agent read him notes of what Jimmy had told him. Gregory said that he had "the story right" and that he, Gregory, had shot the driver five times. Gregory later drew sketches of the bodies of the two victims and stated that the bodies had been burned.

On November 27, 2001, Gregory was indicted together with his brother Jimmy, Dennis Leal, and Johnny and Teddy Orsinger. On motion from the government, the trial was transferred from Prescott, Arizona to larger facilities in Phoenix; the jury was drawn from Prescott. Shortly before trial, Leal, Teddy Orsinger, and Jimmy pled guilty. Trial began December 3, 2002. After ten trial days, the jury, properly instructed on the defense of voluntary intoxication, began deliberations. Both defendants were convicted. Gregory was sentenced to life imprisonment. He now appeals.

## ANALYSIS

*The transfer of the trial to Phoenix.* Gregory Nakai argues that the transfer from the Prescott Division of the District Court for the District of Arizona to the Phoenix Division deprived him of a fair representation of the community. A fair

cross-section of the Prescott community was 16.7 percent Native American, but only 6.1 percent of the jurors who reported for jury duty were Native American. This result, Nakai contends, resulted in a violation of the Sixth Amendment. *Duren v. Missouri*, 439 U.S. 357, 363-67 (1979).

[1] We accept for purposes of this appeal the argument that Native Americans in Arizona constitute a distinctive group, although our cases suggest that Hopi and Navajo are far from being a unitary ethnic block. We cannot accept Nakai's contention that Native Americans were systematically excluded from the jury pool. The venire as drawn consisted of 199 persons, 14.1 percent of whom were Native Americans. The jury commissioner telephoned those in the pool to direct them to Phoenix. She failed to reach 34 because the telephone was not answered or was disconnected or not working, or because there was no telephone. Of the 34 not contacted, 14 were Native American. Nakai contends that their exclusion was systematic because it was asserted by his counsel that "phones are somewhat scarce on the reservation." Counsel added, "I have no statistical evidence or proof of this [but speak] from my own knowledge." The personal knowledge of counsel does not constitute proof of the number of telephone users on the reservation. Nakai's post-trial efforts to provide evidence came too late. Even if we were to accept Nakai's belated evidence of telephones on the reservation, "occasional discrepanc[ies]" occurring for "the sake of expediency" do not constitute a prima facie violation of the Sixth Amendment. *United States v. Erickson*, 75 F.3d 470, 477 (9th Cir. 1996).

Nakai attempts to link his objection to the notification by telephone to his objection to the move of the trial from Prescott, attacking the government's reason as specious. But when in August, 2002, the judge granted the motion to move, there was the difficulty of housing five defendants. Guilty pleas reduced the defendants to two only the day before trial. The district court did not have a discriminatory intent nor abuse its discretion when it set the trial for Phoenix.

*Nakai's exculpatory statements*. After the government introduced Nakai's admission to the FBI agent, the defense attempted through cross-examination of the agent to introduce Nakai's statement to the agent that he "started drinking more" after Teddy Orsinger flipped his car; the statement would have gone to disproving the existence of specific intent in certain of the crimes charged. The statement, however, was inadmissible hearsay. *Williamson v. United States*, 512 U.S. 594, 598-601 (1994). Nakai also sought to introduce by cross-examination a statement he made to a tribal investigator that he thought that they were going to lock the victims in a cabin. Again, this statement would have constituted inadmissible hearsay. In neither instance was the unadmitted hearsay necessary to place the admitted statement in context. *Ortega v. United States*, 203 F.3d 675, 682 (9th Cir. 2000).

[2] *Instruction on conspiracy*. The jury was given a standard instruction on aiding and abetting and also on conspiracy. The conspiracy the jury was instructed that it could find was an agreement "to commit carjacking, robbery, kidnaping, or murder, and use of a firearm during and in relation to a crime of violence as charged in the indictment." The last five words were apparently intended to modify only the firearm count, as no conspiracy had been charged in the indictment. Pursuant to *Pinkerton v. United States*, 328 U.S. 640 (1945), the conspiracy instruction informed the jury that each defendant was "responsible for what the other conspirators said or did to carry out the conspiracy, even if the defendant did not know what they said or did."

[3] Nakai objected to the conspiracy instruction orally and in writing at the trial and continues to object now that it denied his "Fifth Amendment rights to notice of the accusation against him, presentment to the grand jury, and conviction only upon proof beyond a reasonable doubt of each element of the charged offense." There is no doubt that if in fact Nakai had been convicted of conspiracy, we would be bound to reverse his conviction. *Sheppard v. Rees*, 909 F.2d

1234, 1237-38 (9th Cir. 1990). But Nakai was not convicted of conspiracy. The instruction to the jury presented a theory on which his criminal liability for his other acts could be based. This use of *Pinkerton* where conspiracy is not charged in the indictment has been the custom of other circuits. *E.g., United States v. Lopez*, 271 F.3d 472, 480 (3d Cir. 2001); *United States v. Chairez*, 33 F.3d 823, 827 (7th Cir. 1994). We have not ruled on such an instruction.

**[4]** The objection to the instruction is that it broadens a defendant's liability beyond the aiding and abetting charge implicit in any indictment. The instruction also attaches to the defendant's conduct the consequences of his having committed a crime with which he has not been charged. It is error to use a *Pinkerton* instruction in a case in which the indictment does not allege a conspiracy.

**[5]** In the instant case, however, we hold that its use did not constitute fatal error. It was not structural error, that narrow class of error depriving a defendant of a fair trial. It was, therefore, subject to harmless error analysis. *Neder v. United States*, 527 U.S. 1, 8-9 (1999).

**[6]** The testimony of Jimmy Nakai was that Gregory had called for the carjacking, had assaulted Begay, had let Jimmy have his gun, and had later retrieved the gun and shot Sam. Unrebutted, this evidence established each of the crimes of which Gregory was convicted. His own admissions confirmed Jimmy's account. Gregory did not call for a carjacking without the intention to rob and kidnap the driver and the passenger. He did not shoot Sam repeatedly in vital parts without the intent to end his life. He did not use a firearm unintentionally. Even in the absence of the *Pinkerton* instruction, it is beyond reasonable doubt that the jury convicted, or would have convicted Nakai as either an aider and abettor or as a principal. *See United States v. Olano*, 62 F.3d 1180, 1199 (9th Cir. 1995).

**[7]** *The shooting of a corpse?* At oral argument, counsel advanced a new contention, one that the government had no obligation to refute as it had not been argued in the briefs, but one worth exploring. It was contended that there was no evidence that Sam was alive when Gregory shot him. This doubt was one the jury could consider and reject. Gregory acknowledged shooting the driver not firing into a dead man. No testimony showed that the pistol-whipping of Sam was severe enough to cause his death. The jury, briefed on Gregory's drunken state, could still rationally conclude that he would not have wasted his bullets on a corpse. When Gregory was finished with Sam he draped his body with a blanket; the living man he had shot was now, he knew, no longer alive.

AFFIRMED.